UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| HENRY L. MACK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cv-1247-SLD |
| | ) | |
| KURT OSMUNDSON, *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff Henry L. Mack, proceeding pro se and currently incarcerated at Illinois River Correctional Center, brought the present lawsuit pursuant to 42 U.S.C. § 1983, alleging an Eighth Amendment claim for deliberate indifference to a serious medical need related to his Covid-19 symptoms, respiratory distress, and bloody stool. Now before the Court is Defendants Kurt Osmundson, Amalia Manning, Brittany Miller and Tracy Neuendorf's ("Medical Defendants") Motion for Summary Judgment (Doc. 83), Defendant Cherryl Hinthorne's Motion for Summary Judgment (Doc. 85), Defendant Hinthorne's Motion for Leave to File Supplement to Defendant's Motion for Summary Judgment (Doc. 87), Plaintiff's Motion of Inquiry (Doc. 93), and Plaintiff's Motion Seeking Permission to Answer Defendants' Assertion of Scam Rule Violation (Doc. 94). For the reasons that follow, Defendants' Motions for Summary Judgment (Docs. 83, 85), Defendant Hinthorne's Motion for Leave to File Supplement to Defendant's Motion for Summary Judgment (Doc. 87), Plaintiff's Motion of Inquiry (Doc. 93), and Plaintiff's Motion Seeking Permission to Answer Defendant's Assertion of Scam Rule Violation (Doc. 94) are GRANTED.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate if the party opposing summary judgment fails to establish a genuine issue of fact on an element essential to its case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Where one party has properly moved for summary judgment, the non-moving party must respond "by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). The court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"—that is, whether "there is sufficient evidence favoring the non[-]moving party for a jury to return a verdict" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). At summary judgment, a court "constru[es] the record in the light most favorable to the nonmovant and avoid[s] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Where the parties disagree about the facts, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in its favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999) (quoting *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994)).

## PRELIMINARY MATTERS

### A.  Mack's Motion of Inquiry (Doc. 93) and Motion Seeking Permission to Answer Defendants' Assertion of Scam Rule Violation (Doc. 94)

Mack's motions seek to respond to Defendants' objections to the new evidence Mack included in his response to Defendants' motions for summary judgment.  Those motions are granted, and the Court has considered Mack's responses to Defendants' objections that were included in those motions.

### B.  Medical Defendants' Objections to Mack's Exhibits and Affidavit

The Medical Defendants have objected to Mack's use of medical records from prior to 2020 and his use of a nursing protocol document that were not disclosed in discovery in his response to their motion for summary judgment.  (Doc. 90 at 9, 11, 13, 23).  The Medical Defendants also object to Mack's "Affidavit of Veracity" included in his response, which  they argue contradicts Mack's responses to his interrogatories and his deposition in which he stated he did not recall many facts related to this case.

Under the Federal Rules of Civil Procedure, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed.. R. Civ. P. 37(c)(1).  "The exclusion of non-disclosed evidence is 'mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless.'"  *Rossi v. City of Chicago*, 790 F.3d 729, 738 (7th Cir. 2015).  In determining whether a failure to disclosure was substantially justified or harmless, the district court should consider "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or

willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

Moreover, the Sham Affidavit Rule prevents a party from "creat[ing] an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." *Buckner v. Sam's Club, Inc.,* 75 F.3d 290, 292 (7th Cir. 1996). "Thus, where deposition testimony and an affidavit conflict, 'the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy.'" *Dunn v. Menard, Inc*., 880 F.3d 899, 910–11 (7th Cir. 2018) (quoting *Russell v. Acme-Evans Co*., 51 F.3d 64, 67–68 (7th Cir. 1995)).

Mack has not adequately explained why he did not disclose his prior medical records related to the conditions complained about in this lawsuit. He only states that he "thought it was only appropriate that [Mack] set the record straight" when he saw that Defendants were implying that the 2020-2021 timeline was the first time Mack brought up sleep apnea problems to Dr. Osmundson. (Doc. 94 at 3). However, Mack has also now cited to his deposition, which covers this basic contention. (*See* Doc. 89-1 at 83:12–84:17, 151:19–152:5). The deposition testimony does not include Mack's new factual assertion that he discussed his respiratory issues with Dr. Osmundson in 2018. However, the Medical Defendants are not disputing that Dr. Osmundson reviewed Mack's sleep study test results (that had occurred in 2016) with him on June 4, 2018. (Doc. 90 at 12). Moreover, the medical records from prior to Mack's incarceration at Illinois River are merely context to this suit, not material to the claims. Finally, the Court finds that the nursing protocols document is immaterial to this order. Accordingly, the Court finds these objections moot for the purposes of this order.

# MATERIAL FACTS[1]

Mack's claims concern the medical treatment he received as an inmate at the Illinois River Correctional Center ("Illinois River") for his Covid-19 symptoms, respiratory distress, and bloody stool, starting around March 2020.  Mack complains of the medical care he received from Defendants Neuendorf, Miller, Manning, and Osmundson.  Defendant Neuendorf is a licensed practical nurse ("LPN"), Defendant Miller is a Nurse Practitioners ("NP"), Defendant Manning is a Registered Nurse ("RN") and Defendant Osmundson is a medical doctor.  Mack also alleges Defendant Warden Hinthorne, was deliberately indifferent to his medical needs.

## A.  General Procedures for Medical Treatment at Illinois River

To request medical treatment at Illinois River, an inmate can request "sick call" by telling a correctional officer to sign them up for sick call.  However, there is no way for the inmate to know if it will happen or not.  (Doc. 83-4 at 49:7–23).  Mack believes that the officer signs the inmate up for sick call on a signup sheet, but inmates do not personally see the signup sheet. (Doc. 83-4 at 50:2–9).  Around March 2020, due to the outbreak of the Covid-19 pandemic, Illinois River instituted policies that impacted the procedures to administrator medical treatment at Illinois River changed.  These included movement restriction policies intended to prevent or slow the spread of the disease. (Doc. 83-5 at ¶ 49).

As part of her duties, RN Manning also occasionally dispensed prescribed medication to inmates in their housing units.  (Doc. 83-7 at ¶ 16).  To ensure that each inmate is given his required medications, the nursing staff conducting medication rounds cannot treat individual

---

[1] The facts related here are, unless otherwise noted, taken from the Medical Defendants' statement of undisputed material facts, (Doc. 83 at J. 2–23), Warden Hinthorne's undisputed material facts (Doc. 85 at 2–5), Mack's undisputable facts and undisputed material facts, (Doc. 89 at 4–5, 10–14); and from the exhibits to the motions and responses.  Where the parties disagree about the facts, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in its favor.  *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

inmates for non-emergency medical issues.  There is not enough time to dispense all the necessary medication and treat all individuals requesting non-emergency care, nor does nursing staff have medical equipment to respond to a medical emergency.  *Id.* at ¶¶ 17, 20.  Instead, if the need constitutes an emergency, a Code 3 is called and medical personnel respond to further evaluate, treat, transport the patient to the health care unit, or evacuate him to a nearby emergency department, as appropriate.  *Id.* at ¶ 18.  If, however, the need is not an emergency, the nurse would advise the inmate to request sick call by submitting a sick call request slip through the facility's mail system.  *Id.* at ¶¶ 19, 21.

### B.  Mack's March 30, 2020 Treatment by LPN Neuendorf

Mack alleges that LPN Neuendorf was deliberately indifferent to his symptoms when she saw him for sick call on March 30, 2020.  At the sick call, Mack reported a cough that had been ongoing for two to three weeks.  (Doc. 83-8 at ¶ 4).  LPN Neuendorf took Mack's temperature, and found he did not have a fever.  *Id.*; (Doc. 83-4 at 78:21–24).  LPN Neuendorf examined Mack and found his lung sounds were clear bilaterally.  (Doc. 83-8 at ¶ 4).  She noted that she did not observe any redness or swelling in Mack's throat, nasal passages or ear canals.  *Id.* at ¶ 4. LPN Neuendorf determined that Mack's objective presentation and subjective symptomology suggested he was suffering from a cold, rather than a more serious respiratory infection.  *Id.* at ¶ 6. A cold is a common type of upper respiratory infection caused by the rhinovirus. Symptoms of a cold include congestion, runny nose, sneezing, sore throat, coughing, and other symptoms.  Patients with a cold commonly present without a fever.  *Id.* at ¶ 7.  Accordingly, LPN Neuendorf prescribed Mack Guaifenesin tablets—a cough and cold medication that works by thinning mucus that causes congestion, allowing the body to clear it and relieving symptoms of a cold.  *Id.* at ¶ 4–5.  She also advised Mack to increase his fluid intake, take his medication as

prescribed, wash his hands frequently, cover his mouth when coughing, and to return if his symptoms did not improve or worsened over the next three days.  *Id.* at ¶ 4.

Mack, however, believes that he had Covid-19 on March 30, 2020, and should have been tested for it.  He contends that LPN Neuendorf's diagnosis of him as having a cold is "diagnostic bias."  Dr. Osmundson describes Covid-19 as an infectious disease that causes mild to moderate respiratory illness.  Symptoms are variable but often include fever, cough, headache, fatigue, breathing difficulties, loss of taste and loss of smell.  (Doc. 83-5 at ¶ 50).  Mack disputes this characterization, considering many people have died of this disease.  While Mack does not provide support to counter Dr. Osmundson's statements, the Court notes that Covid-19 infections can be plainly be serious in some instances as Covid-19 has claimed over a million lives in the United States alone.  *See* Covid Data Tracker, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited March 25, 2024).

### C.  Mack's Respiratory Distress and Bloody Stools

Mack alleges that Defendants Miller, Manning, and Osmundson were deliberately indifferent to two medical issues he was having: respiratory distress and bloody stools.  Some of the care and appointments he received for these conditions overlapped; the material facts related to these conditions are recounted in chronological order.

Prior to being imprisoned at Illinois River, Mack reports that in November 2011, following a colonoscopy, he was diagnosed with diverticulosis.  He was prescribed high fiber supplements to treat his condition.  In July 2016, Mack had a sleep study while he was at Western Illinois Correctional Center.  Medical records from this appointment show that the treatment plan was to advise Mack to lose weight and re-evaluate in three months.  The medical records also contain the note from July 21, 2016: "obese, does not meet criteria for C-PAP at this

time." (Doc. 89-2 at 2).

At his deposition, Mack testified that he told Dr. Osmundson about his bloody stools and respiratory problems when he first arrived at Illinois River in May 2017. (Doc. 89-1 at 83:12–83:17). He told Dr. Osmundson that he had a colonoscopy in 2011 that showed diverticulosis and that he believed he needed a new colonoscopy because he was experiencing blood in his stools again. *Id.* at 83:18–84:1. Defendant Osmundson advised that a colonoscopy was not necessary, as blood appearing in his stool was normal. *Id.* at 84:1–4. At that time, Mack did not have blood in his stool every day. *Id.* at 84:8–85:17. Mack's sleep study test results (from the July 2016) were reviewed by Dr. Osmundson on June 4, 2018. Nothing in the record shows any additional medical treatment or complaints related to these conditions until March 2020.

On March 27, 2020, Mack requested to be seen on sick call and, on the written request, included in the list of health care issues were that he was experiencing blood in his stool and that he was waking up short of breath. (Doc. 89-2 at 31).[2] Mack also stated in his deposition at he spoke to RN Manning while she was doing temperature checks about his symptoms and she said she would check and see if he had been signed up for sick call. (Doc. 87-1 at 73:20–75:3). As recounted above, Mack was seen in sick call on March 30, 2020. There is no factual support for the allegation that LPN Neuendorf saw the sick call request that listed all of these issues. The parties do not dispute that Mack's bloody stool and shortness of breath was not discussed at the March 30, 2020 sick call.

On May 8, 2020, Mack filed a grievance, which was deemed an emergency grievance by Warden Hinthorne. (Doc. 87-1 at 122:11–123:23; Doc. 85-1 at 3). In the grievance, Mack

---

[2] Mack also complained about his gastroesophageal reflux disease ("GERD") symptoms, but does not appear to be bringing any claims regarding his treatment of GERD.

reported he had not been seen by sick call for his issues of respiratory problems and bloody stool. (Doc. 85-1 at 3). Relevant to this case, he requested he be given an updated sleep study and a colonoscopy. *Id.* The counselor who responded to the grievance on May 22, 2020, wrote that Dr. Osmundson said that Mack needed to sign up for sick call and that there was no documentation in chart of his concerns. *Id.*

On June 3, 2020, Mack went to sick call. (Doc. 83-6 at ¶ 5). Mack was seen by a non-party nurse and reported and waking up during the night due to shortness of breath and also reported gagging. (Doc. 83-6 at ¶ 5; Doc. 83-1 at 10). Mack requested a sleep study and reported he had a sleep study approximately five years earlier. (Doc. 83-6 at ¶ 5).

On June 6, 2020, RN Manning saw Mack after he reported experiencing chest pain. (Doc. 83-7 at ¶ 4).[3] An ECG and objective examination suggested Mack was not experiencing cardiac-induced chest pain. *Id.* at ¶ 6. Dr. Osmundson was not present at the facility at the time, so healthcare staff contacted Dr. Osmundson via phone and referred Mack for further workup. *Id.* at ¶ 7. As part of Mack's additional workup, on June 6, 2020, RN Manning collected a sample to perform a fecal occult blood test, which tested positive for blood. *Id.* at ¶ 8. On June 7 and June 9, 2020, RN Manning collected a second and third fecal sample, both of which tested positive for blood. *Id.* at ¶¶ 9–10.[4] Mack was referred to see Dr. Osmundson or a nurse practitioner. *Id.* at ¶ 10.

On June 10, 2020, NP Miller reviewed Mack's nurse sick call visit notes from June 2 to June 10, 2020. (Doc, 83-6 at ¶ 8). Based on her review, NP Miller ordered a CMP, CBC, iron panel and ferratin tests. *Id.* at ¶ 8. A CMP is a complete (or comprehensive) metabolic panel

---

[3] Mack states that RN Manning responded to a sick call request related to his sleep apnea problem as well as his bloody stool. (Doc. 89 at 10). However, the cited document (Doc. 89-1) does not support this characterization.
[4] Mack states that he was seen on June 9, 2020 for sick call for shortness of breath as well. (Doc. 89 at 10). He does not attach any evidence and this fact has been disputed by Defendants.

that is used to measure fourteen substances in the blood.  It is used to check several body functions and processes, to include liver and kidney health, blood sugar levels, blood protein levels, acid and base balance, fluid and electrolyte balance and metabolism, among others.  *Id.* at ¶ 10.  A CBC is a complete blood count test used to measure many different components found in blood, to include red blood cells, white blood cells, platelets, hemoglobin, hematocrit, and mean corpuscular volume.  *Id.* at ¶ 11.  NP Miller also ordered a chest and abdomen series x-ray, discontinued Mobic and increased Mack's Prilosec prescription to 20 mg twice a day for eight weeks.  *Id.* at ¶ 8.  Additionally, NP Miller instructed nursing staff to schedule a follow up appointment after the results for the labs and x-rays came back.  *Id.* at ¶ 8.

The chest and abdomen x-rays were taken on June 15, 2020.[5]  (Doc. 83-6 at ¶ 12).  The chest x-ray results were unremarkable and there was no indication of cardiopulmonary disease.  *Id.* at ¶ 13.  The abdominal x-ray results were also unremarkable, indicating the diagnostic test revealed no abnormality suggestive of any condition necessitating treatment.  *Id.* at ¶ 14.

On June 24, 2020, NP Miller had a follow up appointment regarding Mack's labs and x-ray results and she informed Mack the diagnostic tests were all within normal limits.  (Doc. 83-6 at ¶ 15).  At this appointment NP Miller saw and treated Mack regarding his bloody stool issue.  (Doc. 89 at 11).[6]  Mack told NP Miller he had had diverticulosis for years and that he had an Esophagogastroduodenoscopy ("EGD") and a colonoscopy around 2010 or 2011.  (Doc. 83-6 at ¶ 15).  Mack indicated he was worried about potential effects of his taking Zantac for five and a half years.  *Id.* at ¶ 16.  NP Miller asked Mack about his present symptoms and Mack denied

---

[5] Mack disputes the facts related to these x-rays, apparently believing that they were not his x-rays due to an incorrect birthdate appearing on the x-ray report. (Doc. 89 at 16).  However, even if these were not Mack x-rays, the Court agrees with Defendants that there is no basis to believe Defendants were subjectively aware of the alleged error.  (Doc. 90 at 24–25).

[6] Mack also notes that the record is "silent" regarding his respiratory issues at this appointment.  The Court agrees that the medical record indicates that Mack's bloody stools were the focus of the appointment.

weight loss, nausea, vomiting, abdominal pain, or constipation. *Id.* at ¶ 16. However, Mack reported twice daily bowel movements, with loose stool and small amounts of blood. *Id.* NP Miller examined Mack and noted he did not display any sign he was experiencing acute distress or pain. *Id.* at ¶ 17. Defendant Miller noted clear lung sounds in both lungs and positive bowel sounds in all four quadrants in Mack's abdomen. *Id.* Mack declined a digital rectal examination. *Id.* In all, NP Miller found the examination to be unremarkable. *Id.* NP Miller did, however, instruct nursing staff to obtain Mack's medical records concerning his prior EGD/colonoscopy, to schedule Mack for a follow-up appointment in seven to ten days, and advised Mack to return to the healthcare unit if his symptoms persisted or worsened. *Id.* at ¶ 18. NP Miller also referred Mack to a gastroenterologist for further workup. *Id.*

NP Miller does not schedule appointments with offsite medical providers. (Doc. 83-6 at ¶ 20). Administrative staff do so by contacting the offsite provider, and requesting the patient be seen based on the provider's availability. *Id.* Starting in the early months of 2020, many offsite providers instituted a Covid-19 screening process for patients. The offsite providers required Illinois River to screen patients for Covid-19 prior to sending them out on writs. *Id.* On July 2, 2020, NP Miller noted that Mack had been referred to a gastroenterologist for a consultation, and was awaiting discussion.

Following this appointment, Mack filed a grievance on July 6, 2020, stating that on June 24, 2020, he "was scheduled to be seen about blood appearing in [his] stool, and that's what [NP Miller] was about to address." He alleged in that grievance that he asked about sleep apnea, but Defendant Miller told him to he needed to see Dr. Osmundson. (Doc. 89-2 at 33).

According to the medical records, on July 29, 2020, Mack saw a non-party nurse for

complaints of shortness of breath in the middle of the night.  (Doc. 83-1 at 22).[7]  Mack informed

the nurse that prior being incarcerated he used to use a continuous positive airway pressure ("C-

PAP") machine, and that when he was incarcerated at Dixon he was using nebulizer treatments

before bed each night and they were effective.  (Doc. 83-1 at 22; Doc. 83-6 at ¶ 23).  The

medical record stated that Mack was informed that he would be referred to Dr. Osmundson.

(Doc. 83-1 at 22).

On July 31, 2020, NP Miller noted in the medical records that Mack was waiting for his

gastroenterology (GI) consult.  (Doc. 83-6 at ¶ 24).  She noted that she would see him after the

consult for further recommendations from the gastroenterologist. *Id*.

On August 13, 2020, NP Miller saw Mack for complaints of shortness of breath at night.

*Id*. at ¶ 25.  Mack reported he was not sleeping well and would nap for an hour in the afternoon.

His lung sounds were clear bilaterally.  *Id*.  NP Miller assessed Mack with insomnia.[8]  *Id*.  NP

Miller educated Mack on weight loss techniques and diet and prescribed three squirts of Nasonex

bilaterally at night.  *Id*.  Nasonex, or mometasone, is a corticosteroid used to prevent and treat

seasonal and year-round allergy symptoms by reducing inflammation in the nasal passages.  *Id*.

at ¶ 26.  Mack was to follow up in two to three months or sooner, as needed.  *Id*. at ¶ 25.

On August 24, 2020, Illinois GI called the healthcare unit (HCU) to coordinate Mack's

gastroenterologist consult.  (Doc. 83-6 at ¶ 27).  Illinois GI indicated that Mack would need to be

isolated and tested for Covid-19 prior to his office visit.  *Id*.  According to the medical records,

---

[7] Mack generally objects to Defendants' and the medical records' characterization of his symptoms as "shortness of breath" (Doc. 89 at 16, 19).  He states that these were symptoms of his sleep apnea and he should have had a sleep study.  Mack's objection is to Defendants' treatment decision and diagnosis, which is the legal basis of his claim.  Mack offers no admissible evidence to rebut that the medical records reflect Defendants genuine beliefs regarding Mack's symptoms and diagnosis.  However, to the extent that Mack objects to the Defendants' omission of the term "sleep apnea" from their undisputed facts, the Court notes instances in the medical records where it states that Mack reported a history of sleep apnea.

[8] Mack objects to the accuracy of this diagnosis, however the fact that Defendant Miller genuinely assessed Mack as having insomnia is not reasonably in dispute.

on September 18, 2020, Mack saw NP Jennifer Greenwood for his gastroenterology consultation. *Id.* at ¶ 28.  NP Greenwood discussed the need for weight loss by dietary modification and regular exercise.  *Id.*  Additionally, NP Greenwood recommended a colonoscopy to rule out diverticulosis, polyps, hemorrhoids, and any malignancy.  *Id.*

On September 22, 2020, Mack's colonoscopy and gastroenterology follow-up referrals were approved.  (Doc. 83-6 at ¶ 29).  Mack's colonoscopy was originally scheduled for December 2, 2020, but it did not occur on that date.  *Id.* at ¶ 30, 32.  While the parties dispute the reason for the rescheduling, (*see* Doc. 89 at 13), Mack does not allege that any of the Defendants were responsible for the appointment not occurring on December 2, 2020.  Mack's colonoscopy was re-scheduled for December 16, 2020.  (Doc. 83-6 at ¶ 33).

On December 6, 2020, RN Manning saw Mack for complaints of difficulty defecating, abdominal pain, and anal pain with defecation.  (Doc. 83-7 at ¶ 12).  RN Manning did not observe any signs that Mack was experiencing any obvious discomfort and Mack's vital signs were largely within normal limits.  *Id.* at ¶ 13.  RN Manning provided Mack with three-day supplies of acetaminophen and ibuprofen (both pain relievers) and instructed Mack to return if his symptoms worsened or interfered with his daily activities.  *Id.* at ¶ 14.  The medical records do not reflect that Mack requested a follow-up appointment for his difficulty defecating, anal or abdominal pain.  *Id.* at ¶ 15.  However, Mack points to grievances from December 2020, in which he claimed at the time that he was attempting to be seen by medical staff for blood in his stool and shortness of breath.  (Doc. 89-2 at 36–37).

On December 13, 2020, Mack tested positive for Covid-19 in anticipation of his attending his appointment on December 16, 2020.  (Doc. 83-6 at ¶ 34).  He was placed in the Covid-19 isolation wing for fourteen days and wrote grievances during this time regarding all of

his claims in this case.[9]  (Doc. 89 at 12).  As a result of Mack's Covid-19 diagnosis, the

colonoscopy was cancelled and rescheduled for March 12, 2021.  (Doc. 83-6 at ¶ 35).  The

rescheduled appointment was the earliest the procedure could be performed, according to the

medical records.  *Id*. at ¶ 36.

On February 24, 2021, NP Miller conducted Mack's annual physical.  (Doc. 83-6 at

¶ 37).  Mack reported he had experienced shortness of breath since he contracted Covid-19.  *Id.*

In response, NP Miller ordered a chest X-ray.  *Id*.  The chest x-ray was done on March 11, 2021,

and showed minimal haziness at the lung bases and early infiltrates were not excluded.  *Id*. at ¶

39.  Mack's lung volumes were moderate.  His trachea was midline and his heart was normal.

No pleural effusion of pneumothorax was seen.  *Id*.

On March 12, 2021, Mack had a colonoscopy.  (Doc. 83-5 at ¶ 8; Doc. 83-6 at ¶ 40).

According to the medical records, gastroenterologist Dr. Jaymon Patel observed multiple non-

bleeding polyps in the rectum and transverse colon but did not attempt resection.  *Id*.  Dr. Patel

further noted the mucosa was normal in the entire examined colon.  He also noted the presence

of non-bleeding internal hemorrhoids.  *Id*.  Dr. Patel recommended the colonoscopy should be

repeated in a month using a two-day prep.[10]  (Doc. 83-5 at ¶ 10; Doc. 83-6 at ¶ 42).  Dr. Patel

noted he "suspect[ed] [Mack's symptoms of] bleeding [were] secondary to hemorrhoids."  (Doc.

93-3 at 19).

On March 25, 2021, Dr. Osmundson saw Mack to evaluate him for an anal fissure. (Doc.

83-5 at ¶ 12).  Upon examination, Dr. Osmundson observed Mack had a 12 o'clock anal fissure

---

[9] The Court finds that Mack's grievances are relevant to his claims only to the extent that they could have put the parties on notice that he believed he had certain symptoms or conditions that were not being adequately treated.

[10] Mack states that the procedure "was botched, due to poor delivery of the colonoscopy prep solution on the part of the heath care staff."  (Doc. 89 at 12).  Defendants object to this fact, but the Court agrees it is immaterial, as Mack does not allege that any of the named Defendants were responsible or otherwise aware of any allegedly poor delivery of the colonoscopy prep solution.

approximately 1 cm by 0.3 cm; he then provided treatment for the anal fissure. *Id.*

Mack was promptly scheduled for the second colonoscopy, which occurred on July 9, 2021. (Doc. 83-6 at ¶ 46; Doc. 83-2 at 17). The colonoscopy results indicated Mack had diverticulosis in the sigmoid colon, the descending colon, the ascending colon, and the traverse colon. (Doc. 83-5 at ¶ 16; Doc. 83-6 at ¶ 48). Dr. Patel removed two polyps from the ascending colon, one polyp in the transverse colon, three polyps in the rectum, sigmoid colon and transverse colon and one polyp in the rectum. (Doc. 83-5 at ¶ 16; Doc. 83-6 at ¶ 48). A polyp is an abnormal growth of cells that sticks out from the surface of a tissue. (Doc. 83-5, ¶ 18). Tissues biopsied during colonoscopies are sent to pathology for further testing. *Id*. at ¶ 17. Dr. Patel also observed non-bleeding internal hemorrhoids. (Doc. 83-5 at ¶ 16; Doc. 83-6 at ¶ 48). Internal hemorrhoids rarely cause discomfort but straining or irritation when passing stool can cause painless bleeding. (Doc. 83-5 at ¶ 19). Dr. Patel recommended Mack have a repeat colonoscopy in three years based on pathology results. (Doc. 83-6 at ¶ 49). He also recommended a high fiber diet and no non-steroidal anti-inflammatory drugs for ten days following the polyp removal. *Id*. The pathology results of the polyps showed a tubular adenoma, tubulovillous adenoma, and hyperplastic polyp. All of which are benign. *Id*. at ¶ 50. While Mack describes these polyps as "pre-cancerous," (Doc. 89 at 17–18), this description does not appear in the medical records. Nonetheless, as Defendants note, certain polyps can develop into cancer if not removed. As Mack's polyps were removed, so was his risk of the polyps becoming cancerous. (*See* Doc. 90 at 31–32, citing "Colorectal polyps," MOUNT SINAI, available online at: mountsinai.org/health-library/diseases-conditions/colorectalpolyps#:~:text=Polyps%20are%20benign%2C%20meaning%20that,than%20polyps%20under%201%20centimeter (last visited Mar. 10, 2024)).

On July 23, 2021, NP Miller saw Mack to follow up from his second colonoscopy. (Doc. 83-6 at ¶ 51). During her examination, NP Miller noted Mack's lung sounds were clear to auscultation bilaterally. *Id.* Mack had positive bowel sounds in all four quadrants and his abdomen was non-distended, soft and non-tender. *Id.* NP Miller prescribed Mack two fiber tablets a day, informed Mack he would need a repeat colonoscopy in three years, and advised him to return to the healthcare unit for any abnormal symptoms. *Id.*

At the end of July 2021, Mack repeatedly saw medical staff complaining of shortness of breath. On July 20, 2021, Mack saw a nurse at sick call for shortness of breath. He was provided with a nebulizer treatment. (Doc. 83-5 at ¶ 25). A nebulizer is a device that turns liquid medicine into a mist for the patient to inhale though a mouthpiece or a mask. *Id.* at ¶ 26. On July 22, 2021, Mack again saw a non-party nurse at sick call requesting a nebulizer treatment. (Doc. 93-2 at 20; Doc. 83-5 at ¶ 27). Mack's lung sounds were diminished and tight. *Id.* A nebulizer treatment was given per protocol for shortness of breath. *Id.* On July 27, 2021, Mack again saw a non-party nurse at sick call for complaints of shortness of breath. (Doc. 93-2 at 23–24; Doc. 83-5 at ¶ 28). He reported waking up feeling like he could not breathe and it appears from the record that he reported he had a history of sleep apnea. *Id.* On July 29, 2021, Mack again saw a non-party nurse at sick call for shortness of breath and reported a history of sleep apnea. He received a nebulizer treatment. (Doc. 93-2 at 25–26; Doc. 83-5 at ¶ 29). Again, on July 30, 2021, Mack saw a non-party nurse at sick call for shortness of breath. The nurse referred him to "MD" sick call. The notes again indicate that Mack reported he had a history of sleep apnea. (Doc. 93-2 at 27–28; Doc. 83-5 at ¶ 30).

Following his referral, Dr. Osmundson saw Mack on August 27, 2021, for his occasional shortness of breath. (Doc. 83-5 at ¶ 31). Mack reported to Dr. Osmundson that the nebulizer

treatments had improved his symptoms.  *Id*.  Dr. Osmundson examined Mack, but the

examination was unremarkable.  *Id*.  Dr. Osmundson assessed Mack with chronic obstructive

pulmonary disease (COPD) and gastroesophageal reflux disease ("GERD").  *Id*.  COPD refers to

a group of diseases such as chronic bronchitis and emphysema that cause airflow blockage and

breathing-related problems.  *Id*. at ¶ 32.  To treat Mack's assessed COPD and asthma, Dr.

Osmundson prescribed one to two puffs of Xopenex, and Alvesco 106 mg.  *Id*. at ¶ 31.  Xopenex

is a short-acting bronchodilator that treats bronchospasms by relaxing the sudden tightening of

muscles in the airways and increasing air flow to the lungs.  Xopenex is prescribed for people

with reversible obstructive airway disease, which includes asthma.  *Id*. at ¶ 33.  Alvesco is a

corticosteroid that provides long term relief by reducing the swelling of the airways in the lungs

to make breathing easier.  It is used to prevent and reduce the symptoms caused by asthma such

as wheezing and shortness of breath.  *Id*. at ¶ 34.  To address Mack's assessed GERD, Dr.

Osmundson prescribed Mack Prilosec 20 mg.  *Id*. at ¶ 31.  Dr. Osmundson also enrolled Mack in

the asthma chronic clinic.  *Id*.

On September 15, 2021, NP Miller saw Mack at the chronic clinic for asthma. (Doc. 83-6

at ¶ 52).  NP Miller rated Mack's asthma outcome and condition as good and stable.  *Id*.

According to the medical records, on September 22, 2021, Mack saw a nonparty nurse

for complaints of difficulty breathing when sleeping at night.  (Doc 93-2 at 31; Doc. 83-5 at

¶ 36).  He reported waking up gasping for air and that the Alvesco and Xopenex were not

effective.  *Id*.  The nurse noted Mack's lungs were clear bilaterally.  *Id*.  She noted he had a

history of hypertension and sleep apnea.  The nurse referred Mack to see a doctor or a nurse

practitioner.  *Id*.  Sleep apnea is a disorder in which people experience disrupted breathing while

they are sleeping.  The two main types of sleep apnea are obstructive sleep apnea (OSA) and

central sleep apnea (CSA).  (Doc. 83-5 at ¶ 37).  OSA is caused by the narrowing of the airway during sleep which leads to breathing disruptions.  *Id*. at ¶ 38.  CSA is caused by a lack of communication between the brain and the muscles involved in breathing.  *Id*. at ¶ 39.

On September 28, 2021, Mack saw a nonparty nurse practitioner regarding sleep apnea and the effectiveness of his two inhalers.  (Doc 93-2 at 32–33; Doc. 83-5 at ¶ 41).  The NP did not observe any respiratory distress when examining Mack's lungs.  *Id*.  The NP noted Mack was obese and discussed the benefit of losing weight.  *Id*.  Weight loss can be beneficial for people with sleep apnea because excess weight causes pharyngeal fat to accumulate around the neck. Pharyngeal fat can block a person's upper airway during sleep when the airway is already relaxed. Additional abdominal fat can also diminish airflow by decreasing lung volume and compressing a person's chest wall.  (Doc. 83-5 at ¶ 42).  According to the records, the nurse practitioner advised Mack to try sleeping in a reclining position, to prevent disruptions in his breathing patterns while asleep.  (Doc 93-2 at 32–33; Doc. 83-5 at ¶ 44).  According to the NP's note, Mack left the exam room without allowing the NP to complete the assessment.  *Id*.

According to the records, on October 27, 2021, a non-party NP saw Mack to do an Epworth Sleep Scale.  The NP noted Mack did not have any shortness of breath and his lungs sounds were clear.  The NP referred Mack for an on-site sleep study evaluation.  (Doc. 93-2 at 37; Doc. 93-3 at 23; Doc. 83-5 at ¶ 45).  The Epworth Sleep Scale is used to gauge a patient's propensity to fall asleep while engaged in common daily activities and is commonly utilized during work up to assess sleep apnea and need for additional treatment.  (Doc. 83-5 at ¶ 46).  On October 27, 2021, Mack scored an 18 on the Epworth test, indicating that he needed to get more sleep, improve his sleep practices, or seek medical attention to determine why he was sleepy. (Doc. 93-3 at 22; Doc. 83-5 at ¶ 47).  On November 10, 2021, Dr. Osmundson noted that Mack's

referral for an onsite sleep study had been approved.  (Doc. 83-5 at ¶ 48).

### D.  Mack's Complaints Regarding Warden Hinthorne's

Mack also brings claims against Warden Hinthorne.  Warden Hinthorne was the warden of Illinois River during the relevant time frame and is not a medical professional.  (Doc. 87-1 at 126:15–23)

Mack spoke with Warden Hinthorne regarding his issues three times: March 27, May 3, and July 2020.  (Doc. 87-1 at 117:4–13, 120:14–121:19, 131:19–132:4).  During the March 27, 2020 conversation, Mack told Warden Hinthorne about his respiratory issues and blood in his stool and that he had been signing up for Sick Call to address the issues but was not getting called to Sick Call or otherwise having the issues addressed.  *Id*. at 75:4–16, 117:14–118:3.  Mack was seen at Sick Call three days later on March 30, 2020.  *Id*. at 75:17–76:2, 118:4–119:4.  On May 3, 2020, Mack told Warden Hinthorne the Sick Call nurse from March 30, 2020 told Mack that he would be referred to a doctor to address his issues but that he had yet to see a doctor.  (Doc. 87-1  at 121:20–122:7).  After the conversation, Mack filed a grievance, which was deemed an emergency grievance by Warden Hinthorne.  Dr. Osmundson, responded by indicating Mack needed to sign up for Sick Call.  (Doc. 87-1 at 122:11–123:23).  However, Mack takes issue with Warden Hinthorne signing the grievance and interpreted it as Warden Hinthorne agreeing with Dr. Osmundson.  Mack alleges he had another conversation with Warden Hinthorne in July 2020.  *Id*. at 131:19–133:8.  Mack acknowledges following his three conversations with Warden Hinthorne, Mack received medical attention each time.  *Id*. at 115:21–116:14, 137:6–24.

With respect to why Mack sued Warden Hinthorne regarding his Covid-19 symptoms and Covid-19 precautions, Mack asserted two concerns: (1) Illinois River was not doing Covid-19

testing despite most other prisons doing so; and (2) Illinois River's protocol was to remove inmates who tested positive for Covid-19 but leave behind their cellmates who could have been exposed to Covid-19 from the sick inmate by being in the same cell as the sick inmate and then the left-behind cellmate becomes a super-spreader amongst the general prison population.  (Doc. 87-1 at 139:17–142:18).

Mack tested positive for Covid-19 in December 2020 and, although Mack asserts he contracted Covid-19 from his cellmate at the time who was exhibiting Covid-19 symptoms, Mack acknowledges he does not know for certain that he contracted Covid-19 from his cellmate. (Doc. 87-1 at 142:23–145:14).  Mack further acknowledges he is personally unaware of all the information utilized at Illinois River when administration determined whether and when an inmate needed to be quarantined based on COVID-19.  *Id*. at 145:15–147:2.  Mack believes he contracted COVID-19 in March 2020 due to the symptoms he had at that time, but Mack is unsure because he was never tested.  *Id*. at 147:3–149:11.  Mack also recounts that he filed grievances regarding Warden Hinthorne's Covid-19 policies both during and after he had Covid-19 in December 2020.  (*See* Doc. 89 at 13–15).  Mack also asserts that on May 22, 2022, Warden Hinthorne published a warden bulletin/ memo changing the Covid-19 protocol that entailed isolating both cellmates if one tested positive for Covid-19, which was one of the policies Mack believed Defendant Hinthorne should have initiated earlier.  *Id*. at 13.

## PROCEDURAL HISTORY

Mack filed this lawsuit on August 31, 2021.  (Doc. 1).  The Court's Merit Review found that Mack stated an Eighth Amendment claim for deliberate indifference to a serious medical need against Defendants Osmundson, Manning, and Hinthorne.  (Doc. 7).  Defendants Miller and Neuendorf were allowed to be added as Defendants on September 29, 2022.  On August 7, 2023,

Defendants Osmundson, Manning, Miller, and Neuendorf filed their motion for summary judgment (Doc. 83) and Warden Hinthorne filed her motion for summary judgment (Doc. 85). Mack filed a combined response (Doc. 89) on August 18, 2023. Defendants Osmundson, Manning, Miller, and Neuendorf filed a reply (Doc. 90). This Order now follows.

## ANALYSIS

### A. Deliberate Indifference Standard

Inmates are entitled to adequate medical care under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). To maintain a deliberate indifference claim for medical treatment, the plaintiff must show" (1) [he] suffered an objectively serious medical condition; (2) the defendant[s] in question knew of the condition and was deliberately indifferent to treating [the plaintiff]]; and (3) this deliberate indifference injured [the plaintiff]." *Stockton v. Milwaukee Cnty.,* 44 F.4th 605, 614 (7th Cir. 2022). Claims of negligence, medical malpractice, or disagreement with a prescribed course of treatment are not sufficient. *See Petties v. Carter*, 836 F.3d 722, 729–30 (7th Cir. 2016) (en banc); *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016).

A medical condition is objectively serious if "a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (citation omitted). The condition does not need to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). The parties do not dispute that Mack had serious medical conditions that required treatment.

However, Mack also needed to provide evidence that showed that Defendants were deliberately indifferent to his medical needs and that their deliberate indifference caused him harm.  A prison official acts with deliberate indifference when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  A prison official's subjective awareness of a risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*. at 842.

Courts defer to treatment decisions made by medical professionals unless the evidence shows that "no minimally competent professional would have so responded under those circumstances."  *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008).  A treatment decision permits an inference that the medical provider acted with deliberate indifference only when the decision constitutes "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment."  *Petties*, 836 F.3d at 729 (internal quotations omitted).  Persisting in a course of treatment known to be ineffective, failing to follow an existing protocol, delaying treatment without penological justification, and refusing to follow a specialist's recommendations may permit an inference that a medical professional failed to exercise the appropriate judgment.  *Id.* at 729–30; *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (explaining that "these cases are better framed 'not [as] deliberate indifference to a serious medical need,' but as a challenge to 'a deliberate decision by a doctor to treat a medical need in a particular manner.'" (quoting *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996)).

### B. Mack's Claims Against The Medical Defendants.

#### 1. Mack's March 30, 2020 Illness

Mack alleges that he received inadequate medical care from LPN Neuendorf on March 30, 2020 at sick call. He believes he had Covid-19 at that time and he should have been tested and treated accordingly. LPN Neuendorf, however, did examine Mack and found his symptoms did not indicate Covid-19 or other serious respiratory infection. Instead, LPN Neuendorf believed he had a common cold and provided treatment for that condition. While Mack might disagree with this diagnosis, he has not made any plausible showing that "no minimally competent professional would have so responded under those circumstances." *Sain*, 512 F.3d at 894–95. Notably, as far as symptom management, Mack does not make any argument for how his medical condition should have been treated differently even if it was Covid-19. While a Covid-19 diagnosis might have resulted in him being quarantined, the quarantine would have had no impact on his medical condition at that time. Accordingly, the Court finds that no reasonable jury could find that LPN Neuendorf was deliberately indifferent to Mack's illness at his March 30, 2020 appointment and that she is entitled to summary judgment on this claim.

#### 2. Mack's Bloody Stools

Mack also argues that the Medical Defendants were deliberately indifferent to his complaints regarding his bloody stools because they knowingly delayed treatment. While Mack informed Dr. Osmundson he had occasional bloody stool in 2018, nothing in the record shows that Mack sought further treatment until in March 2020. However, he did not begin *receiving* treatment for this issue until June 2020. In June 2020, RN Manning saw him related to chest pain and collected fecal samples, both of which tested positive for blood. Mack was referred to see Dr. Osmundson or a nurse practitioner. After, NP Miller ordered additional tests, she saw

him on June 24, 2020, and in addition to other treatment, referred him to a gastroenterologist. RN Manning also saw him in December 6, 2020, and gave him pain medication related to pain defecating. Dr. Osmundson also treated him for an anal fissure in March 2021.  Notably, while Mack was referred to the gastroenterologist on June 24, 2020 he did not meet with the gastroenterologist until September 2020, and his first colonoscopy did not occur until March 12, 2021.  A second colonoscopy on July 23, 2021, removed polyps.  After having his colonoscopies, Mack does allege any further issues related to his bloody stools.

Mack has not shown that any of the Defendants were deliberately indifferent to his medical needs related to his bloody stools.  The only delay in Mack's treatment for his bloody stools that could be attributed to Defendants is from when he first complained about these issues in March 2020 until he was referred to the gastroenterologist on June 24, 2020.  During this time, Mack stated in his deposition that he spoke to RN Manning while she was doing temperature checks about his symptoms and she said she would check and see if he had been signed up for sick call prior to March 27, 2020.  (Doc. 87-1 at 73:20–75:3).  (In his response, Mack argues more specifically, that he told RN Manning and LPN Neuendorf on each day between March 23-26, 2020, that he was experiencing blood in his stool and sleep apnea related symptoms).  Mack argues that these encounters should have been documented in the medical records, and the lack of documentation shows deliberate indifference.  Mack argues that LPN Neuendorf should have treated his bloody stool and respiratory issues at his March 30, 2020, sick call visit.  Finally, Mack argues that Dr. Osmundson was deliberately indifferent as of May 2020, because he was aware of the delay in treatment due to the grievance Dr. Osmundson responded to on or about May 22, 2020, in which Dr. Osmundson only advised he sign up for sick call.

However, by itself, a deferral of treatment for non-emergency issues does not show deliberate indifference. *Rankin v. Baker*, 770 F. App'x 752, 754 (7th Cir. 2019) (finding no deliberate indifference where Defendant refused to treat a non-emergency condition during a unrelated medical appointment).  Mack has not shown that his symptoms of bloody stools (or respiratory issues) were emergency issues, especially given that both of these conditions had been long term conditions that existed prior to his incarceration at Illinois River in 2018.  The decision, if there was one, to defer examination and treatment for his bloody stool and focus on his immediate needs regarding treatment of his cold-like symptoms at the March 30, 2020 appointment is not sufficient to show deliberate indifference.  Mack has also not provided any evidence that Dr. Osmundson's response to his May 2020 grievances (that he should sign up for sick call to have his conditions addressed) was unreasonable.  Moreover, while Mack takes issue with the lack of documentation, Mack has not refuted the fact that neither RN Manning nor LPN Neuendorf would not have had the capacity to address medical issues during their rounds.  (*See* Doc. 83-7 at ¶¶ 17, 20).  Overall, the delay in receiving treatment, even if it was shown to be a deliberate action on the part of the Defendants, does not amount to deliberate indifference to a serious medical condition where he was treated at sick call three months after first raising the non-emergency issue and promptly referred to a gastroenterologist.

Further, while it took over a year for Mack to have his colonoscopies, Mack has not shown that this delay caused him any harm. *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) ("No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of failure to treat the condition without providing evidence that the failure caused injury or a serious risk of injury.").  Where a delay in treatment is at issue, "a plaintiff must offer medical evidence that

tends to confirm or corroborate a claim that the delay was detrimental." *Williams*, 491 F.3d at 715. Non-expert testimony "is sufficient as long as it permits the fact-finder to determine whether the delay caused additional harm." *Jackson v. Sheriff of Winnebago Cty., Ill.*, 74 F.4th 496, 501 (7th Cir. 2023). Unless a plaintiff can proffer no evidence that the delay exacerbated an injury, summary judgment is not appropriate. *Id.*

Here, Mack notes his understanding that the polyps were "pre-cancerous" and *could have* led to cancer. However, to prevail on a deliberate indifference claim, a plaintiff must provide proof of an objectively significant risk of harm that has "in fact materialize[d]." *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023). When Mack's polyps were removed, the risk of those polyps developing into cancer was also removed. Additionally, Mack has not provided any medical evidence that the polyps were the cause of his bleeding. Rather the gastroenterologist "suspected" that the bleeding was a symptom of internal hemorrhoids. Accordingly, the Court finds that the Medical Defendants are entitled to summary judgment on this claim.

### 3.  Mack's Respiratory Issues/ Sleep Apnea Condition

Mack also alleges that the Medical Defendants were deliberately indifferent to his medical needs when they delayed ordering a sleep study and providing a C-PAP machine. Dr. Osmundson knew that Mack had previously had a sleep study in July 2016 and had reviewed the results with him in June 2018. Nothing in the record indicates that Mack needed additional treatment for his respiratory issues at that time or, if he did, that he communicated that alleged need to Dr. Osmundson. Moreover, like his bloody stool issues addressed above, the Court finds that the delay in treating Mack between March 2020 and June 2020 is not evidence of deliberate indifference given the non-emergency nature of these conditions. Relatedly, Mack argues that his sleep apnea related issues should have been addressed by NP Miller on June 24, 2020.

However, assuming NP Miller refused to address his respiratory issues at this appointment—which was a follow-up appointment to review test results—he has similarly not shown deliberate indifference for the treatment refusal either. Notably, NP Miller examined Mack and noted he did not display any observable sign that he was experiencing acute distress, that his lungs were clear, and that, overall, there were no remarkable conditions found. A deferral of treatment for his non-emergency complaints regarding respiratory issues or sleep apnea at an appointment scheduled to address other concerns does not show deliberate indifference. *Rankin*, 770 F. App'x at 754.

Moreover, while a sleep study was not ordered until November 2021, the medical records show that Mack symptoms of shortness of breath were investigated and addressed at various medical appointments prior to the sleep study being ordered. Mack was first seen specifically for respiratory issues on June 3, 2020, by a non-party nurse, when he complained of shortness of breath. Shortly after, on June 6, 2020, RN Manning saw Mack for chest pain and performed numerous diagnostic tests. Following this appointment, Mack was treated multiple additional times for shortness of breath. On July 29, 2020, he saw a non-party nurse for these issues and was referred to Dr. Osmundson. On August 13, 2020, he saw NP Miller for his complaints about shortness of breath at night. She treated him by educating him on weight loss and prescribing a drug that is used to prevent and treat allergy symptoms. Mack argues that she should have done diagnostic testing at this appointment. However, even if Mack believes she should have treated him differently, he has not shown that her treatment decisions at this appointment to educate him on weight loss and prescribe an allergy medicine were "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that [NP Miller] actually did not base the decision[s] on such a judgment." *Petties*, 836 F.3d at 729 (internal

quotations omitted).

Mack argues that Defendants were deliberately indifferent when he complained about shortness of breath while he had Covid-19 in December 2020 and did not receive proper treatment. There is no evidence that Mack was scheduled for sick call. Mack argues that he directly told RN Manning while she was doing her rounds of his complaints. However, as stated above, Mack does not offer any evidence to dispute that RN Manning did not have the ability to record medical complaints while doing rounds. Mack was required to sign up for sick call. Moreover, Mack acknowledges that he was under quarantine for fourteen days in December 2020 and saw a nurse every day while in quarantine and does not allege any emergency medical needs were ignored. While Mack may argue that he requested to be placed on sick call but was not, his lack of placement on sick call does not show deliberate indifference by any of the named Defendants.

After Mack had Covid-19, he was seen by NP Miller for his annual appointment on February 24, 2021, at which he reported shortness of breath since contracting Covid-19. In response, NP Miller ordered a chest x-ray. The results did not indicate further treatment was necessary. There is no evidence in the record that Mack sought treatment for his shortness of breath again until July 2021. At that time, Mack saw non-party nurses multiple times for waking up with shortness of breath and was given nebulizer treatments. He reported that these treatments had improved his symptoms when he saw Dr. Osmundson on August 27, 2021. At this appointment, Dr. Osmundson assessed Mack's symptoms as being caused by COPD and GERD and treated Mack accordingly. Dr. Osmundson also enrolled Mack in an asthma clinic. At the asthma clinic on September 15, 2021, NP Miller rated Mack's asthma outcome and condition as good and stable. Mack received additional medical treatment for his breathing

interruptions on September 28, 2021, when he saw a non-party NP.  Finally, as symptoms of

Mack's sleep apnea persisted, Mack receive an Epworth Sleep Scale test and a referral for an

onsite sleep study in October and November of 2021.

While Mack disagrees that his shortness of breath was cause by COPD, GERD, or

asthma, the medical record indicates that treatments for these conditions helped his symptoms.

Moreover, Mack has not provided any evidence that he did not have these conditions or that any

of these responses to his symptoms and treatment decisions of shortness of breath were "so

inadequate that [they] demonstrated an absence of professional judgment."  *White v. Woods*, 48

F.4th 853, 862 (7th Cir. 2022) (internal quotations omitted).  *See also Stockton v. Milwaukee

Cnty.,* 44 F.4th 605, 616 (7th Cir. 2022) ("Evidence that a defendant's course of treatment was

consistent with other ailments may prove fatal to a deliberate indifference claim.").  Overall,

while it is clear that Mack disagrees with his medical treatment and believes he should have

received a sleep study and a C-PAP machine when he was first seen, he has provided any

evidence to show that the Defendants' alternative treatment decisions were the result of

deliberate indifference.  Accordingly, the Court finds that the Medical Defendants are entitled to

summary judgment on this issue as well.

### C.  Mack's Claims Against Warden Hinthorne

Mack brings two distinct claims against Warden Hinthorne: deliberate indifference to his

specific medical needs and deliberate indifference regarding her Covid-19 policies.  However,

the record shows that Warden Hinthorne was not deliberately indifferent in either regard.  On the

contrary, after speaking with Warden Hinthorne on or about March 27, 2020, Mack was seen on

sick call on March 30, 2020, which he believes was her influence.  (Doc. 87-1 at 115:21–116:14,

137:6–24).  Mack argues that Warden Hinthorne should not have deferred to Dr. Osmundson's

response to his May 2020 grievance and that she should have done more to ensure he was getting proper medical care. However, once Warden Hinthorne confirmed that lack of access to medical care was not an issue, she was entitled to defer to the expertise of the professionals providing medical care without fear of liability. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (nonmedical prison officials "are entitled to defer to the judgment of jail health professionals" so long as the inmate's complaints are not ignored).

Mack's argument that Warden Hinthorne was deliberately indifferent to a serious medical condition because she failed to implement certain policies related to the Covid-19 pandemic also fails. Risk of exposure to Covid-19 in prison may be sufficient to satisfy the objective standard of an Eighth Amendment claim. *See Ducksworth v. Maassen,* No. 22-CV-149-WMC, 2023 WL 8764698, at *3 (W.D. Wis. Dec. 19, 2023) (collecting cases). However, Mack has not shown that Warden Hinthorne was deliberately indifferent to this risk. While Mack argues that Warden Hinthorne should have conducted routine Covid-19 testing of inmates early on during the pandemic and quarantined cellmates of inmates that had been exposed to Covid-19 from their cellmate, a defendant need not respond perfectly to a risk to avoid liability; merely reasonably. *See Wilson v. Williams*, 961 F.3d 829,  840-41 (6th 2020). *See also Rowe v. Buss*, No. 21-1182, 2021 WL 5232512, at *2 (7th Cir. Nov. 10, 2021) (affirming district court's dismissal of deliberate indifferent claim regarding Covid-19 policies where plaintiff took issue with assistant warden's decision to life "the quarantine requirement for inmates who return from medical visits and follow safety measures" when the policy specifically conditioned the quarantine exemption on compliance with the specific safety measures). Mack's suggestion of additional policies that Warden Hinthorne could have invoked in addition to the policies she did invoke does not make her response unreasonable.

Moreover, Mack has not shown that the lack of these policies were tied to any specific harm.  Assuming Mack had Covid-19 in March 2020, Mack not being tested for Covid-19 could not have impacted whether he had Covid-19.  And, when Mack had Covid-19 in December 2020, he has not presented any evidence linking his Covid-19 infection with the lack of a policy requiring quarantining of cellmates of individuals who tested positive.  Accordingly, summary judgment will be entered in favor of Defendant Warden Hinthorne as well.

**IT IS THEREFORE ORDERED:**

1) **Plaintiff's Motion of Inquiry [93] and Motion Seeking Permission to Answer Defendant's Assertion of Scam Rule Violation [94] are GRANTED.**

2) **Defendant Osmundson, Manning, Miller and Neuendorf's Motion for Summary Judgment [83], Defendant Hinthorne's Motion for Summary Judgment [85] and Defendant Hinthorne's Motion for Leave to File Supplement [87] are GRANTED. The clerk of the court is directed to enter judgment in favor of Defendants and against Plaintiff. Plaintiff remains responsible for the $350.00 filing fee.**

3) **If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal in forma pauperis MUST identify the issues the Plaintiff will present on appeal to assist the court in determining whether the appeal is taken in good faith. *See* Fed. R. App. P. 24(a)(1)(c); *see also Celske v Edwards*, 164 F.3d 396, 398 (7th Cir. 1999)(an appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a reasonable assessment of the issue of good faith."); *Walker v. O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000)(providing that a good faith appeal is an appeal that "a reasonable person could suppose…has some merit" from a legal perspective). If Plaintiff does choose to appeal, he will be liable for the $605.00 appellate filing fee regardless of the outcome of the appeal.**

Entered this 25th day of March 2024.

*s/ Sara Darrow*
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE